IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-2264

**MCKENZIE KELLER,**

    Plaintiff,

v.

**LA QUINTA FRANCHISING, LLC;**

**CPLG PROPERTIES, LLC,**

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff McKenzie Keller ("McKenzie") by and through counsel respectfully complains as follows:

### PARTIES

1. Plaintiff MCKENZIE KELLER ("**McKenzie**") is a natural person residing in Clark County, NV. Plaintiff originally declared her intent to proceed under a pseudonym. Her trafficker has since been convicted and imprisoned, so she has decided to proceed under her true name.

2. Defendant LA QUINTA FRANCHISING, LLC ("**La Quinta**") is a Nevada limited liability company with its principal place of business in Morris County, NJ. On reference, at all relevant times "La Quinta" was the franchisor that set—and monitored compliance with—the brand standards for the La Quinta hotel,

[ 1 ]

located at located at 7190 W. Hampden Ave, Lakewood, CO 80227 (the "Lakewood La Quinta").

3. Defendant CPLG PROPERTIES, LLC f/k/a LQ PROPERTIES, LLC f/k/a BRE/LQ, LLC ("**CPLG**") owned—and, on information and belief, operated—the Lakewood La Quinta at all times relevant to this suit. CPLG is a Delaware limited liability company with its principal place of business in Dallas County, TX.

4. Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principles, trustees, sureties, subrogees, representatives, and insurers at all times relevant to this action.

## INTRODUCTION

### Pimpology

5. One doesn't have to be chained up to be trapped in prostitution. As most people recognize, women involved in prostitution nearly always feel trapped in a life they want to escape.[1]

6. Despite this, in the popular imagination "sex trafficking" is something completely different from prostitution—something that only happens to sympathetic women. In popular depictions of sex trafficking, the victim is nearly always a respectable girl from a good home who has been kidnapped off the street and who has been forced to sell her body solely by violence and the threat of violence.

---

[1] Rachel Moran & Melissa Farley, Consent, Coercion, and Culpability: Is Prostitution Stigmatized Work or an Exploitative and Violent Practice Rooted in Sex, Race, and Class Inequality?, 48 Archives of Sexual Behavior 1950-51 (2019).

[ 2 ]

7. But, "[t]his popular image of sex traffickers and the victims of sex trafficking is almost completely wrong . . . About the only thing Hollywood gets right is the brutal men, and even that is more complicated."[2]

8. Most victims of sex trafficking aren't cuddly, and many are not obviously victims. Few trafficking victims cry for help, because few see themselves as needing help. Most are street savvy and tough as nails. Many are flaky or personally difficult. Nearly all have a wealth of past traumas, and it is usually those past traumas that make them vulnerable to exploitation.

9. No little girl dreams of becoming a prostitute. Most girls who do become prostitutes are coerced into it, and even those who aren't coerced at first usually suffer coercion later.[3] Nearly half are still children when they turn their first trick.[4]

10. The individual risk factors for both "consensual" prostitution and sex trafficking overlap almost completely, including in both cases PTSD, trauma, childhood abuse and neglect, substance abuse, poverty and housing instability, foster care or dysfunctional family dynamics.[5]

---

[2] Brian Joseph, Vegas Concierge: Sex Trafficking, Hip Hop, and Corruption in America XII (2024).

[3] *See* Jody Raphael, Jessica Alice Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (coercion increases greatly with time).

[4] Melissa Farley et al., *Prostitution and Trafficking in Nine Countries: An Update on Violence and Posttraumatic Stress Disorder*, 2 JOURNAL OF TRAUMA PRACTICE 40 (2004) (42% of prostitutes in the U.S. started as children).

[5] Lara Gerassi, From Exploitation to Industry: Definitions, Risks, and Consequences of Domestic Sexual Exploitation and Sex Work Among Women and Girls, 25 JOURNAL OF HUMAN BEHAVIOR IN THE SOCIAL ENV'T 591-605 (2015).

[ 3 ]

11. Regardless of how they got into the sex trade, most women who work as prostitutes are not working for themselves. Figures vary, but studies of prostitution in the U.S. find that 80-90% of prostitutes are controlled by pimps.[6]

12. The sex traffickers who exploit these women and girls call themselves pimps, but that is a distinction without a difference—the great majority of pimps use threats and physical violence to keep their "stable" of girls hardworking and loyal.[7]

13. And physical violence is not the pimp's only tool of coercion. As Ken Ivy, a Milwaukee pimp, explains in his startlingly explicit book *Pimpology: The 48 Laws of the Game*, pimps are also master manipulators, ready to ferret out the weaknesses and pressure points left by a girl's past traumas and use them to create dependence:

> Most hoes have low self-esteem for a reason. A pimp looks for that weakness, and if it isn't on the surface, he brings that motherfucker out of them. . . . Weakness is the best trait a person can find in someone they want to control. You have to tear someone's ego down to nothing before they will start looking to you for salvation.[8]

14. As those familiar with "the Life" know, "most hoes don't even like sex."[9] Rather, they are usually in desperate situations and dealing with unresolved traumas

---

[6] Farley, Melissa et al., *Online Prostitution and Trafficking,* ALBANY LAW REVIEW, 1039 (2014), *available at* albanylawreview.org/article/70164-onlineprostitution-and-trafficking (collecting studies).

[7] Jody Raphael, Jessica Alice Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (finding over 75% of pimp-controlled prostitutes said their pimps physically abused them, and under half said they could leave without physical harm); *See also* C. Williamson & T. Cluse-Tolar, *Pimp-controlled prostitution: Still an integral part of street life.* 8 VIOLENCE AGAINST WOMEN 1085 (2002) ("The extent to which women felt threatened by a pimp was, in part, a function of her evaluation of the likelihood that he will become physically violent. This threat had been realized by all of the women in the study.").

[8] Pimpin' Ken & Karen Hunter, Pimpology: The 48 Laws of the Game 22 (2008) ("Law 5: Prey on the Weak").

[9] Pimpin' Ken & Karen Hunter, Pimpology: The 48 Laws of the Game 77 (2008).

that make them susceptible to manipulation and coercion by pimps who seek them out and purport to provide them with the love, care, and security that they've been deprived of.

15. Still, even non-violent pimps leverage the ever-present threat of other pimps' violence to help coerce women they suspect of being independent sex workers—"renegades," in the language of the Life—into "choosing up" and becoming *their* girls.

16. In his book, Mr. Ivy—a self-proclaimed non-violent pimp—recalls taking control of a naïve sex worker who made the mistake of speaking to him by telling her: "A solo ho without a pimp will soon be under pimp arrest or worse. It's in your best interest to choose a pimp. It's in your best interest to choose Pimpin' Ken."[10]

> It is standard practice for pimps to take all, or nearly all, of the money earned by the women and girls they control. The pimps then use the money to pay for their victims' needs, but only as and when it suits them. This creates total dependence, both practical and psychological, on the pimp.[11]

17. To quote Ken Ivy again, "The more someone depends on you, the more power you have over them. To master someone completely, they have to depend on you for everything."[12]

18. Common control techniques include retaining control of victims' identification documents, telling stories about the horrible fates suffered by girls who

---

[10] Pimpin' Ken & Karen Hunter, Pimpology: The 48 Laws of the Game 79 (2008).

[11] *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html.

[12] Pimpin' Ken & Karen Hunter, Pimpology: The 48 Laws of the Game 20 (2008).

[ 5 ]

disobeyed other pimps, and threatening to have CPS separate victims from their children if they disobey.

19. Other methods of coercion include withholding food, sleep deprivation, and induced substance abuse/drug addiction. Courts have long recognized these tactics to be methods of coercion used in human trafficking.

20. As Justice William J. Brennan explained, "drug addiction or the weakness resulting from a lack of food, sleep, or medical care . . . would not reappear with such depressing regularity [in trafficking cases] if they were ineffective." *United States v. Kozminski*, 487 U.S. 931, 957 (Brennan, J., concurring) (collecting cases).

21. Traffickers use substances to keep their victims too physically incapacitated to resist and to create a physical reliance on the trafficker out of fear of withdrawal.[13] Most sex trafficking victims—up to 84% according to one study—report their trafficker used substances to exploit them during their victimization period.[14]

22. Of course, pimps use carrots as well as sticks. Extravagant promises of comfortable retirement are nearly universal, as are shorter-term promises of nice clothes, jewelry, and the like. But follow-through on even the short-term promises is rare, and retirement is all but unheard of.

23. Still, many victims cling to their pimps' fraudulent promises out of a desperate need for something to hope for when all other happy endings seem closed to them.

---

[13] Planty L. Langton et al, Sex Trafficking and Substance Use: Identifying High-Priority Needs Within the Criminal Justice System, 9 RAND HEALTH QUARTERLY 14 (2022).

[14] Eastwood-Paticchio, Emma, *Addicted to You: Drug Addiction as a Means of Coercion*, HUMAN TRAFFICKING INSTITUTE (30 January 2019), *available at* https://traffickinginstitute.org/addicted-to-you-drug-addiction-as-a-means-of-coercion/ (noting prevalence of induced substance use in various human trafficking surveys and reports).

24. Many victims are also desperate to be loved.

25. A "Romeo pimp" is a sex trafficker who deliberately feigns love and emotion connection to manipulate and control their victims. They knowingly misrepresent the nature of the relationship to induce victims into commercial sexual activity under false pretenses.

26. Notably, these false promises of love, marriage, and retirement are just some of the many tools in a pimp's toolbox. They are not mutually exclusive from—and usually operate in tandem with—other methods of force, fraud, and coercion often including physical violence.

27. All told, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and financial consequences. On reference, for more than half of all prostitutes these potential consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

28. For most women living it, the life of a pimp-controlled prostitute is a hellish prison from which escape seems not just impossible, but unthinkable. Contrary to the popular image, pimp-controlled prostitution is what sex trafficking looks like in America today.

29. Fortunately, federal law recognizes this complex reality. The Trafficking Victims Protection Reauthorization Act ("TVPRA"), at 18 U.S.C. § 1591, defines a human trafficker as:

> Whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act.

30. "Coercion," as used in the statute's definition of human trafficking, includes:

> threats of serious harm to or physical restraint against any person; [or] any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint against any person

31. "Serious harm," as used in the statute's definition of coercion, means:

> Any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

32. Reading the TVPRA's criminal provision together with its incorporated definitions, human trafficking means using (or recklessly disregarding the use of) force, fraud, or threats of "any harm" that would be "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person ***of the same background and in the same circumstances*** . . . to continue performing commercial sexual activity."

33. Contrary to the comfortable myth spread by those who benefit from prostitution occurring on their properties, there is no way to welcome any degree of "consensual prostitution" without welcoming an even greater degree of sex trafficking.

34. This is because the vast majority of American prostitutes—on reference, at least three-quarters—are victims of sex trafficking within the meaning of the TVPRA.

35. In recent years, many American law enforcement agencies have "overhauled their approach to prostitutes, trying to be more respectful and

compassionate in their interactions with them while still enforcing prostitution laws, recognizing all prostitutes are victims, and putting a greater focus on identifying and arresting their pimps."[15]

36. However, people other than police, prosecutors, and victim advocates think of the average prostitute as a human trafficking victim, but that failure isn't because most people are ignorant of the relevant facts. After all, the phrase "pimp slap" didn't enter the lexicon because people think pimps are cuddly and supportive.

37. Rather, most people fail to see prostitutes as victims because judgmental attitudes toward prostitutes—and dismissive attitudes toward their suffering—are deeply rooted in popular culture. In other words, most people know prostitutes are usually coerced, they just don't care.

38. In this case, McKenzie spent roughly four years under the control of a single trafficker who beat her constantly, threatened to separate her from her children, and insisted on controlling every penny she earned so that she remained totally dependent on him.

39. Sadly, McKenzie's story is far from unique—most prostitutes are subjected to similarly coercive treatment. As will be shown in the next section, casinos and casino workers have long been intimately familiar with the sex industry. They *know* most prostitutes are victims like McKenzie.

Hospitable to Trafficking

40. By their nature, hotels tend to be located in close proximity to event spaces, airports and highways. They offer temporary, anonymous, private, and cost-effective lodgings that are convenient for busy travelers.

---

[15] Brian Joseph, Vegas Concierge: Sex Trafficking, Hip Hop, and Corruption in America 35 (2024).

41. The same factors also make them prime venues for human trafficking.

42. According to a 2018 Polaris Project report, three quarters (75%) of sex trafficking victims surveyed had spent time in a hotel during their trafficking, and four fifths of victims who spent time in a hotel (i.e. 60% of all victims) had engaged in commercial sex inside of a hotel.

43. Similarly, as of 2020, among all active federal prosecutions for human trafficking involving a completed sex act, over three quarters (77%) involved commercial sex at a hotel.

44. As a result, hotel employees encounter victims of sex trafficking far more often than members of the general public.

45. The hotel industry is aware, and has long been aware, that this problem runs rampant behind its guestroom doors.

46. Sex trafficking is a problem that could not exist—not on anything like the same scale, at least—absent the willing cooperation of the hospitality industry, in whose rooms the great majority of the victims' suffering occurs.

## BACKGROUND

### McKenzie's Trafficking Begins

47. By 2010, when McKenzie was 21 years old, she was a single mother was working two jobs to keep her daughter fed, clothed, and housed.

48. Unfortunately, in about 2012 she started dating a man named Delquan Danford. The relationship was controlling and abusive from early in its existence, with Delquan frequently helping himself to money McKenzie had earned working as a dancer.

49. Around the time McKenzie's second daughter was born in August of 2013, Delquan borrowed McKenzie's car for a work commute and fell asleep on the drive home, crashing it.

50. This was a turning point in the relationship. Delquan decided he was tired of working, so he quit his jobs and demanded that McKenzie support him.

51. When McKenzie's insurance paid out for the damage to her car, he forced her to hand over the entire check to him.

52. Unsatisfied with the life McKenzie could provide for him through legitimate employment, Delquan followed the advice of one of his cousins, who was an experienced pimp, and forced McKenzie to sell her body to support his habits.

53. Delquan used a variety of coercive methods to force McKenzie to engage in commercial sex for his benefit. He beat McKenzie regularly when she displeased him. He carried guns and used them to threaten McKenzie. He threatened to take McKenzie's children from her, or to report her to Child Protective Services ("CPS") so that CPS would take her children.

54. Delquan was a sophisticated abuser. On the advice of his cousin, he deployed a mix of promises and threats, love bombs and beatings, to build a cage around McKenzie's mind.

55. At first, Delquan forced McKenzie to bring home a nightly "trap" of $500. Over time, his demands increased until McKenzie had to bring home $1,000 per night to avoid punishment. Sometimes punishment meant emotional manipulation, but often it meant beatings.

56. Delquan would post online ads offering McKenzie for commercial sex. To keep McKenzie obedient, he would sometimes print the ads and threaten to show them to her family.

57. Delquan also insisted on controlling every penny McKenzie earned, forcing her into a state of total dependence on him for even the most basic necessities.

58. Soon after forcing her into prostitution, Delquan and his cousin took McKenzie to a tattoo parlor, where Delquan forced McKenzie to have his street name "Greezy" tattooed in large letters on her left forearm. Throughout McKenzie's trafficking, this "brand," as such tattoos are known in the Life, was conspicuously visible to anyone she interacted with.

59. Branding is commonly used by pimps both to advertise and to reinforce their control over their victims. In particular, brands serve to put other pimps on notice that their bearers already belong to someone.

60. For nearly four years beginning in 2012, Delquan forced McKenzie to have sex with as many as ten men per day, almost every day.

61. Delquan trafficked McKenzie in casinos on the Las Vegas Strip and hotels in Salt Lake City, Utah and Lakewood, Colorado.

62. In Las Vegas, Delquan forced McKenzie to "walk the carpet" and perform "out calls." "Walking the carpet" is analogous to "walking the street" but inside of a casino. An "out call" is when a sex worker travels to the client's location, rather than the client coming to the sex worker.

63. In Salt Lake City and Lakewood, Delquan periodically sent McKenzie to do "in calls" in hotels. An "in call" is when a customer comes to a sex worker's location—usually a hotel room—for commercial sex.

64. Delquan would fly McKenzie to Lakewood, Colorado, near Denver and force her to sell herself from hotel rooms there.

65. When he sent McKenzie to Lakewood, Delquan would often remain behind in Las Vegas, keeping her children with him. Delquan used her children as a

lever to control her, both when they were together in Las Vegas and when he forced her to travel and leave them behind.

66. Delquan would sometimes force McKenzie's children to call her and tell her that she was never going to see them again.

67. Around 2015, Delquan became sure enough of his control over McKenzie—and unhappy enough with the burdens of childcare—that he handed McKenzie's children over to her mother (the children's grandmother).

68. With that development, it became possible for McKenzie to contemplate escape, but it was not until an incident in 2016, in which McKenzie was nearly murdered by a john, that McKenzie's fear of the results of obeying Delquan finally outweighed her fear of disobeying him.

69. McKenzie escaped Delquan's control for good in about April of 2016.

70. As she came to terms with what she had been through, McKenzie began to seek justice against Delquan for what he'd put her and her children through.

71. McKenzie still suffers the physical and emotional aftereffects of this and other attacks, as well as of being forced to have sex with thousands of strange men during the years she was trafficked.

### McKenzie's trafficking in Lakewood, Colorado

72. In Lakewood, Colorado, McKenzie stayed at and was sold for sex out of the Lakewood La Quinta on between three and seven occasions during 2015 and 2016.

73. McKenzie had a routine for how she operated while working for Delquan in Lakewood, Colorado. On each occasion when she stayed at the Lakewood La Quinta, she would:

> a. have visible bruises—in several cases a black eye—at the time of her check-in;

      b.      rent rooms under her real name, using her real identification;

      c.      pay rent day-to-day or a few days at time throughout the stay;

      d.      frequently request rooms in the back of the properties;

      e.      request fresh linens from hotel staff each day;

      f.      dispose of the used condoms in the hotel trash cans and toilets (wrappers always went in the trash); and

      g.      except for rare occasions when Delquan handled the ads from his base in Las Vegas, post ads on websites known for facilitating commercial sex using the hotel's wifi.

74. At the Lakewood La Quinta, McKenzie would average between five and ten "in calls" per day. There was therefore a regular flow of men who were not guests of the hotels going in and out of McKenzie's room every day she was there.

75. McKenzie usually met johns in the hotel lobby or by the elevators to ensure they got in, to make them feel secure, and to walk them up to her room. Each time she did this, she was transparently dressed for sex work.

76. At hotels with exterior room doors, McKenzie would wait for johns in her room. However, the Lakewood La Quinta all had interior lobbies, so the front desk employees at all four hotels watched on numerous occasions as McKenzie met johns to lead them up to her room. They also watched those johns come back down an hour or two later without her, after which the pattern would usually repeat several more times.

77. During these stays, McKenzie would transfer her earnings to Delquan every day via Walmart-to-Walmart payments. Eventually, apparently tired of the $9.50 service charge with each transaction, Delquan began making McKenzie deposit the money directly into his bank account.

[ 14 ]

78. On one occasion at the Lakewood La Quinta, McKenzie opened a condom for the customer, only to turn around and find a gun pointed at her head. Once McKenzie convinced him that he was on camera and her pimp was in the room across the hall, the customer returned her belongings and fled.

79. This incident occurred just two weeks after McKenzie narrowly avoided being raped on an out call.

80. These two incidents occurring so close in time pushed McKenzie past her breaking point. After the perpetrator fled her room, McKenzie had a breakdown and recognized that her death would be imminent—and her children would no longer have a mother—if she didn't get out somehow. McKenzie contacted her mother and ran to stay with her, bringing only the clothes on her back. She never got her belongings back, let alone any of the money Delquan took from her.

81. McKenzie was successful in her escape from Delquan, but her trauma remains.

### La Quinta's Control over and Knowledge of CPLG's Conduct

82. Based on the La Quinta Inn Franchise Disclosure Document ("FDD") for the year 2016, the operative franchise agreement between CPLG and La Quinta provided:

   a. CPLG must purchase all signage, uniforms, furniture, linens, interior design elements, and electronic equipment from a limited selection of Approved Vendors selling a limited selection of La Quinta-designed and/or -approved products.

   b. CPLG must designate an "Operating Partner" who is a natural person who has "the authority to bind [CPLG] regarding all operational decisions" and who has "completed [La Quinta]'s training program to [its] satisfaction," and CPLG must give that partner at least a 10% stake in its business. CPLG's choice of "Operating Partner" is subject to La Quinta's approval.

   c. CPLG must put their proposed general manager(s) through a lengthy La Quinta-run and La Quinta-evaluated manager

        training program, which the general manager(s) must complete to La Quinta's satisfaction—effectively giving La Quinta total discretionary control over the management of CPLG' hotel location.

    d.    CPLG must put all "managers, front office personnel and certain other designated personnel" through La Quinta-run and La Quinta-evaluated training.

        i.    CPLG employees must complete these trainings and related evaluations to La Quinta's satisfaction, effectively giving La Quinta discretionary control over the employment of front desk staff and managers at the Lakewood La Quinta.

        ii.    By assigning specific trainings to specific job titles, Days Inn effectively mandates that CPLG adopt Days Inn's preferred scheme of job titles and responsibilities.

    e.    CPLG must use La Quinta's designated "Reservation System" as its sole reservation system.

    f.    CPLG must use La Quinta's approved property management system, NiteVision 3.1, which is "designed and intended to manage accumulated data, including but not limited to data relating to reservations, occupancy, guest services, marketing support, registration information, check-in and check-out information, housekeeping data, and accounts receivable data.

        i.    La Quinta has "independent access to information and data on your computer system, including the information supplied to Nite Vision and NetREZ which is automatically transmitted to us."

        ii.    All guest information input into the NiteVision and NetRez systems belongs to La Quinta as "trade secrets and proprietary information."

        iii.    On information and belief, La Quinta used the information and data stored in the NiteVision 3.1 system by the Lakewood La Quinta to identify several trends indicating it was a hotbed for human trafficking, including excessive requests for fresh linens, unusually frequent plumbing expenses due to flushed condoms, excessive cash payments, and staff notes suggesting guests were being trafficked.

    g.    CPLG must use La Quinta's NetRez Revenue Management software, which "interfaces with NiteVision 3.1 and [La Quinta]'s central reservations system" to suggest more profitable room rates based on historical performance and performance of comparable properties.

[ 16 ]

    h.    La Quinta has the right to conduct quality assurance inspections without prior notice. Franchisees that fail inspections may be required to pay a fee for re-inspection or face termination.

    i.    Unlike almost every other franchisor, La Quinta in 2015 did not require its franchisees to use a specific vendor for guest wireless internet service, although it reserved the right to change that policy.

    j.    CPLG must additionally comply with the much more detailed brand standards contained in the confidential "La Quinta Brand Standards Manual." These requirements are in CPLG and La Quinta's exclusive knowledge, but upon information and belief they include:

        i.    A requirement that CPLG employ a specified vendor to provide guest internet access, which specified vendor provides La Quinta with unfettered access to all guest browsing records, such that La Quinta knows every time a guest posts to a website like megapersonals or Backpage.com.

        ii.    Specific requirements that CPLG record and inform La Quinta of evidence of criminal activity, particularly evidence indicative of sex trafficking like excessive used condoms left behind, excessive requests for linens, and excessive foot traffic to particular rooms.

        iii.    Suggested pay rates and terms of employment for each job title defined by La Quinta in its training program.

83. On information and belief, CPLG jointly performed their above-specified duties under the operative franchise agreement in full, and La Quinta exercised its above-specified rights to access information and to direct the operations of the Lakewood La Quinta in full.

84. It is a standard practice in the hospitality industry for franchisors to monitor all guest reviews and complaints on online platforms, and for franchisors to charge franchisees a fee if they fail to respond promptly to a negative review. On information and belief, La Quinta incorporated this general practice into its operative franchise agreements with CPLG and/or their incorporated brand standards covering the relevant period.

85. La Quinta knew, throughout the relevant period, that their franchise locations played host to at least thousands and likely many tens of thousands of instances of sex trafficking each year.

## CAUSES OF ACTION
### COUNT I: 18 U.S.C. § 1595 ("TVPRA")

86. Plaintiff incorporates each foregoing and subsequent allegation.

87. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

88. Through their acts and omissions described above, CPLG and La Quinta are "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a), and they are thus liable under 18 U.S.C. § 1595.

89. More specifically, CPLG and La Quinta "harbor[ed]" and "maintain[ed]" Plaintiff within the meaning of § 1591(a), and the Casino Defendants additionally "provide[d]" Plaintiff.

90. Through their acts and omissions described above, CPLG and La Quinta benefit[ted] financially from Plaintiff's sex trafficking due to their participation in a venture that they knew or should have known earned money from sex trafficking, and they are thus liable under 18 U.S.C. § 1595.

91. Similarly, CPLG participated in the "venture" of operating its hotel when it knew or should have known that its hotel had engaged in violations of § 1591.

92. Similarly, La Quinta participated in the "venture" of its franchisor-franchisee relationship when it knew or should have known that the relationship had engaged in violations of § 1591.

93. Plaintiff is therefore entitled to bring an action against each Defendant for damages under 18 U.S.C. § 1595.

[ 18 ]

## COUNT II: C.R.S. 13-21-127

94. Plaintiff incorporates each foregoing and subsequent allegation.

95. Plaintiff is a victim of human trafficking for sexual servitude in the meaning of C.R.S. 18-3-504(1)(a).

96. Through their actions described above, La Quinta and CPLG proximately caused Plaintiff's trafficking within the meaning of C.R.S. 18-3-504(1)(a).

97. Through their actions described above, La Quinta and CPLG caused damages to the Plaintiff, as described in C.R.S. 13-21-127(1).

98. Plaintiff is therefore entitled to bring an action against La Quinta and CPLG for damages under C.R.S. 13-21-127.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

   a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

   b. Disgorgement of profits and/or restitution;

   c. Punitive damages, attorneys' fees, and expenses;

   d. The costs of this action;

   e. Pre- and post-judgment interest; and

   f. Any other relief the Court or jury deems appropriate.

**A TRIAL BY JURY IS HEREBY DEMANDED.**

DATED this July 23, 2025.

*/s/ Jonathan Hilton*

**JONATHAN L. HILTON, ESQ**.
**GEOFFREY C. PARKER, ESQ**.
(*Pro hac vice forthcoming*)
HILTON PARKER LLC
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068
(614)992-2277
jhilton@hiltonparker.com

**THE702FIRM**
**MICHAEL C. KANE, ESQ.**
(*Pro hac vice forthcoming*)
**BRADLEY J. MYERS, ESQ.**
(*Pro hac vice forthcoming*)
**JOEL S. HENGSTLER, ESQ.**
(*Pro hac vice forthcoming*)
THE702FIRM INJURY ATTORNEYS
400 South 7th Street, Suite 400
Las Vegas, Nevada 89101
(702) 776-3333
service@the702firm.com

*Attorneys for Plaintiff McKenzie Keller*

[ 20 ]